**UNITED STATES of America**

v.

**Carmine TRAMUNTI et al.,
Defendants.**

**No. 73 Cr. 1099.**

United States District Court,
S. D. New York.

Jan. 17, 1974.

See also D.C., 377 F.Supp. 6.

Paul J. Curran, U. S. Atty. by Walter M. Phillips, Jr., Thomas E. Engel, Thomas M. Fortuin, Asst U. S. Attys., of counsel, for the Government.

Frank A. Lopez, Brooklyn, N. Y., for moving defendant, Joseph DiNapoli.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

John Spurdis is a liar.

District Judges are charged with the responsibility of determining credibility of witnesses because our court system recognizes that the signs of credibility are more than just those found in a cold record. Spurdis' testimony is, in and of itself, inherently incredible. It is clear that he changed his story from time to

time as it suited him; but my conclusion as to his credibility is dictated not only by these factors but by watching a man of supreme ego attempting to toy with the truth and with our court system. The record does not show that Spurdis as a witness attempted from time to time to whisper instructions to me so that he could have complete control over the proceedings. The record cannot show his demeanor, the way he shifted uneasily as he spun out his tale nor his fleeting smiles of unwarranted contempt when he thought he had blunted the cross-examination and avoided provable perjury.

For all of these reasons, I reject entirely the testimony of the witness John Spurdis.

Having done so, I must turn therefore to find the facts as proven in the hearing on this motion to suppress certain evidence seized from a green Pontiac automobile in connection with the arrest of Vincent Papa, a co-conspirator in this case, and the defendant and movant, Joseph DiNapoli.

On the evening of February 3, 1972, agents of the Joint Task Force were sent out to execute certain arrest warrants. Patrolman George Reilly, with his partner (then) Detective John Spurdis, were sent out with a "John Doe" warrant. Group Supervisor Peter Pallatroni and Agent James Reed were to arrest George Rossi. Both arrests were to be made in connection with violations of the narcotics laws. At about 8:00 in the evening, Spurdis and Reilly brought their unmarked police car to the vicinity of 1908 Bronxdale Avenue, in the Bronx. They had reason to suspect that this address was being used in connection with the sale and distribution of narcotics. Indeed, Officer Reilly had been on surveillance at this address for some twenty evenings prior to the night in question. The reasons that the Joint Task Force had placed this address under surveillance were that the automobile of Genevieve Patalano, who resided at the address, was seen being used in connection with the transfer of certain narcotics at

the Cottage Inn Bar & Grill. The transfer of narcotics at the Cottage Inn apparently was not a sometimes thing. Allusions to at least four such transactions were made in the hearing. The owner or manager of the Cottage Inn, Joseph DeBenedetto, was seen leaving the Bronxdale Avenue address in possession of a stolen car and when he was arrested he claimed (falsely) that he resided at this address.

On the night of February 3, 1972, it was raining quite hard. For about forty-five minutes Reilly and Spurdis sat and watched the one family house at 1908 Bronxdale Avenue. At about 8:45 p. m. a green Pontiac pulled up in front of the house and a then unknown white male left the car and entered the house carrying a suitcase or valise. The driver of the car then made a "U" turn and parked on the side of the street opposite the house under surveillance. Reilly and Spurdis pulled up and saw the driver of the green Pontiac leave the car. Apparently the driver stared at Reilly and Spurdis and both immediately identified the driver as Vincent Papa.

Vincent Papa was known to officers and agents working with the Joint Task Force. Papa had a previous arrest record including a conviction for narcotics violations. Information had been given to the Joint Task Force by an informant, Stanton Garland, that Papa was a major supplier of narcotics. Stanton Garland has since proved unreliable since he became a fugitive (or at least disappeared) rather than testify in another case. Doubt is also cast on his reliability because he committed various violations of law while supposedly cooperating with the Joint Task Force. But there is absolutely no indication that Reilly, Spurdis, Pallatroni or Reed had any indications of this unreliability on February 3, 1972. Indeed, the opposite conclusion must be reached—certain information which Garland gave the Joint Task Force had proven reliable.

The testimony at the hearing also proved that at least Pallatroni and most likely the other officers present that

night, knew that Papa had also been indicted for narcotics violations in the Eastern District of New York. The sealed indictment had been opened during the previous month.

When Reilly and Spurdis spotted Vincent Papa in the vicinity of 1908 Bronxdale Avenue, and after they saw him enter the suspect address, Officer Reilly radioed to his superior, Group Supervisor Pallatroni. After some conversation on the radio, in which Reilly indicated that Papa had gone into 1908 Bronxdale Avenue, a place far from Papa's usual haunts in Queens County, Pallatroni and Agent Reed came to assist in the surveillance. Spurdis left his unmarked car and told Pallatroni and Reed about what he and Reilly had seen. Spurdis identified Papa and gave Pallatroni a description of the other man seen entering the house. The description which was given to Pallatroni matched a "John Doe # 3", a person whom Spurdis had seen engaged in a narcotics transaction (apparently for $\frac{1}{8}$ kilo of heroin) at the Cottage Inn Bar & Grill. Spurdis also gave Pallatroni the license number of the green Pontiac in which Papa had driven up to the suspect premises.

Pallatroni radioed the license plate number of the green Pontiac to the headquarters of the Joint Task Force, asking who the record owner of the car was. He was informed that the vehicle was a rental or leased car owned by a Wide World Leasing Corporation. Pallatroni had information that Vincent Papa owned two cars. As an experienced narcotics officer, he knew that narcotics violators often use rented or leased cars while engaged in a narcotics violation. Apparently this modus operandi is used because vehicles seized in connection with narcotics transactions are generally forfeited to the government.

At the hearing it was shown that, in fact, the green Pontiac was a courtesy car, loaned to Papa by his cousin, a sales and service employee of Wides Motor Sales, while his own car was being repaired.

So at least by 9:00 p. m. on the night in question Agent Pallatroni reasonably believed that a major narcotics violator was away from his usual haunts in a house which a reasonable person could suspect as having been involved in major narcotics transactions.

The fact that certain beliefs that Agent Pallatroni held on February 3, 1972 were later proved untrue is of no import. To determine whether probable cause existed for Group Supervisor Pallatroni to arrest Vincent Papa and Joseph DiNapoli on the night of February 3, 1972, we must look to his state of mind as of that night. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L. Ed.2d 134 (1959).

Turning back to the events of the evening of February 3, 1972, I find that Officer Reilly observed, and reported to Group Supervisor Pallatroni, that at about 8:55 p. m. three women left the one family private house at 1908 Bronxdale Avenue, entered a car and drove away. They returned about fifteen minutes later.

Some minutes later, at about 9:15 p. m., Reilly and Spurdis spotted a gentleman leaving the house under surveillance and getting into a car. Reilly reported this to Group Supervisor Pallatroni, who started his vehicle and followed the car of the man leaving the house. This surveillance took Pallatroni and Reed across Bronxdale Avenue to the Bronx River Parkway-South on the Bronx River Parkway to its intersection with the Cross Bronx Expressway where the car they were following exited and apparently made a complete loop to the entrance to the Bronx River Parkway Northbound, thus apparently going in a circle from whence it came. At this point Agents Pallatroni and Reed ceased their surveillance of the car.

Both Pallatroni and Reed testified that they believed that this car was being used to "take the heat off" a ma-

jor illegal transaction by deflecting any surveillance by law enforcement officers. Pallatroni testified as an experienced narcotics officer that he had experience with such diversionary tactics in prior situations and, therefore, they immediately returned to the area of 1908 Bronxdale Avenue.

In fact, as shown at the hearing, Pallatroni and Reed were following the car of an attorney who was at the suspect address in connection with matters unrelated to the present indictment. This attorney testified that he left the residence at 1908 Bronxdale Avenue and was bound for his home along a route which would bring him onto the Cross Bronx Expressway-Westbound. He described the turnoff from the Bronx River Parkway to the entrance of the Cross Bronx Expressway as being a loop. He further testified that the convergence of traffic could cause a car going to the Cross Bronx Expressway Westbound to be forced onto the Bronx River Parkway Northbound. He stated that he had no memory of the February 3, 1972 drive from 1908 Bronxdale Avenue to the Cross Bronx Expressway.

In any event, Pallatroni and Reed broke off surveillance when they thought they were being "fooled" and used "to take the heat off" a major illegal transaction. To say that their belief was wrong is of no help to the issues of this motion. A Monday morning quarterback is always right. But in the real world we must deal with the belief and the state of mind of Agent Pallatroni as of the evening of February 3, 1973.

Shortly after Pallatroni and Reed broke off surveillance of the car and had returned to the vicinity of 1908 Bronxdale Avenue, they were advised by Officer Reilly that two unidentified men had left the suspect house. Each of these men entered a car and each sped off in such fashion that the agents could not read their license plates.

Finally, at about 9:30 p. m., Spurdis and Reilly saw Vincent Papa and Joseph DiNapoli leave 1908 Bronxdale Avenue. Apparently DiNapoli was carrying the same suitcase which the officers had observed being brought into the house previously. DiNapoli was carrying the suitcase with two hands and walking in such a way that the suitcase appeared very heavy.

Both Papa and DiNapoli got into the green Pontiac, placing the heavy suitcase in the back seat. They then drove away with Pallatroni and Reed following immediately after the green Pontiac. Officer Reilly had contacted them on the radio, telling Pallatroni and Reed that "Papa was leaving the house with the suitcase. It appears to be heavy."

After a few blocks, the Reilly-Spurdis vehicle passed Reed and Pallatroni and fell in immediately behind the green Pontiac. The heavy rain continued as the cars wended their way through the Bronx. Pallatroni became apprehensive about losing the Pontiac because of the weather and the dark. Finally he ordered Reilly and Spurdis to stop the Pontiac.

Spurdis, who was driving, pulled the unmarked police car alongside of the Pontiac and Officer Reilly held his badge out and shouted at Papa to pull over. Both cars continued to roll parallel for a few feet and Reilly shouted again for Papa to pull over. Papa stopped his car near the intersection of East Tremont Avenue and Castlehill Avenue in the Bronx. Spurdis drove his car in front of the Pontiac and Pallatroni brought his vehicle to a stop behind.

Papa got out of the Pontiac and started to walk towards Spurdis and Reilly. Pallatroni shouted to Spurdis to arrest Papa. Spurdis did arrest Papa and left him to Reilly to secure. Pallatroni arrested DiNapoli, who had been sitting in the Pontiac, and took him over to the wall of St. Raymond's Cemetery which is located at the intersection where the car was stopped. Reed then secured DiNapoli while Pallatroni turned to help Spurdis, who had taken the suitcase out of the car and opened it.

Inside the suitcase was about a million dollars in United States currency.

It is this money which the defendant DiNapoli seeks to suppress.

■ Though the above factual determinations are somewhat lengthy, I found this to be most necessary. As the United States Supreme Court has stated: "The constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case." Sibron v. New York, 392 U.S. 40, 59, 88 S.Ct. 1889, 1901, 20 L.Ed.2d 917 (1968).

Turning then to the legal arguments, counsel for DiNapoli and his co-counsel contend:

First, there was no probable cause for Agent Pallatroni or the other officers to stop the green Pontiac and arrest either Papa or DiNapoli;

Second, there was no reason for Agent Pallatroni or the other officers to search the automobile without a warrant after they had arrested and secured both Papa and DiNapoli; and

Third, there was no reason for Agent Pallatroni or the other officers to open the suitcase without a warrant after they had secured Papa and DiNapoli and taken possession of the car.

■ In making these arguments the defense has suggested that I view the facts as set out above in isolation and with the full clarity of hindsight. I refuse to do so since I believe the law to be otherwise,

"Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."

Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

The fact that the officers proved erroneous in their judgment that the suitcase contained narcotics does not invalidate the arrest if their initial belief was reasonable. The Supreme Court has repeatedly emphasized that probable cause must not be judged by hindsight.

"Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed. It is important, we think, that this requirement be strictly enforced, for the standard set by the Constitution protects both the officer and the citizen. If the officer acts with probable cause, he is protected even though it turns out that the citizen is innocent." Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959) (citations omitted).

In applying this standard the facts and circumstances on which the officers relied must be considered in their totality, not as isolated events. Raffone v. Adams, 468 F.2d 860 (2d Cir. 1972). Applying these standards, I find that Agent Pallatroni had probable cause to stop and arrest Vincent Papa and Joseph DiNapoli on the night in question and had probable cause to search the automobile for contraband. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); United States v. Christophe, 470 F.2d 865 (2d Cir. 1972). That search reasonably included opening the suspect suitcase. United States v. Christophe, *supra*.

The motion to suppress the evidence in question is therefore denied.

So ordered.