UNITED STATES of America

v.

Robert CURRINGTON and Frank Townsend, Defendants.

No. 77 Cr. 721.

United States District Court, S. D. New York.

Feb. 24, 1978.

Robert B. Fiske, Jr., U. S. Atty., S.D. N.Y., New York City, for the Government; by Harry C. Batchelder, Jr., Robert J. Costello, William J. Kelleher, Asst. U. S. Attys., New York City, of counsel.

Lawrence K. Feitell, New York City, for defendant Currington; Michael J. Gillen, Grunewald, Turk, Gillen & Caliendo, New York City, for defendant Townsend; by Donald J. Feldman, New York City, of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

Defendants Robert Currington and Frank Townsend, indicted in two counts alleging possession of heroin in violation of 21 U.S.C. §§ 812, 841(a)(1) and .841(b)(1)(A), have moved under Fed.R.Crim.P. 41(e) to suppress evidence found in Townsend's car and apartment and in Currington's apartment. Primarily, they claim that police officers lacked sufficient probable cause to stop and search Townsend's car and that, as a result, all evidence ultimately derived from that search must be suppressed as "fruit of the poisonous tree." After having heard and considered extensive testimony during a five day evidentiary hearing held between January 26, 1978 and February 6, 1978, it is my conclusion that the searches were proper in all respects and accordingly the motion to suppress is denied.

## FACTS

On the morning of August 18, 1977, Agent Richard Bell of the Drug Enforcement Administration ("DEA") [1] was on surveillance in the area of West 90th Street and Columbus Avenue in Manhattan when he observed Frank Townsend drive up in a 1977 cream-colored Thunderbird. Bell recognized Townsend from a flier put out by the Unified Intelligence Division (an organization made up of New York State and City police officers, federal agents, and DEA agents) and a "rap sheet" circulated by the New York City Police Department. According to both the flier and the rap sheet, Townsend was considered a major narcotics dealer. Moreover, Bell knew that an informant previously found reliable by the DEA had identified Townsend as the ultimate source of a sample of heroin distributed in March or April of 1977.

Bell closely observed Townsend as the latter parked near the intersection of West 90th Street and Columbus Avenue, emerged from his car, and entered an apartment building at 35 West 90th Street. Bell knew this building to be the residence of Robert Currington, with whom Bell had had prior dealings concerning narcotics. In March 1977, Bell had met Currington in a restaurant on the upper west side of Manhattan, at which time Currington had unsuccessfully attempted to buy some cocaine from Bell. Furthermore, Bell had observed Currington transacting sales of heroin with a DEA informant on two occasions in April 1977, and had watched as Currington accepted delivery of 480 bars of mannite (a substance often used to dilute heroin for sale) on May 17, 1977. In sum, Bell had reason to be suspicious of a meeting between Townsend and Currington under any circumstances.

Approximately twenty minutes after Townsend had entered the building at 35 West 90th Street, he emerged with Currington, who carried a briefcase or attache case (hereinafter referred to by the generic term "briefcase"). After one or both of the pair had briefly visited a nearby stationery

---

1. Agent Bell has been a special agent with the DEA since July 1973. Prior to that time, he was an investigator in the Office of Drug Abuse Law Enforcement for fifteen months.

store, they got into Townsend's car with the briefcase and drove south down Columbus Avenue. In the meantime, Bell had ascertained that the Thunderbird was leased to M.T.S. Industries by Daks Auto Leasing on Long Island. Radioing for back-up from fellow-agents, Bell followed the Thunderbird as it turned right on 86th Street, right again on West End Avenue, left on 96th Street, and entered the West Side Highway heading north toward the Henry Hudson Parkway. As he followed the Thunderbird up the West Side Highway to the Henry Hudson Bridge, Bell observed Townsend driving evasively—that is, speeding up and slowing down for no apparent reason.

Eventually, Townsend exited from the Henry Hudson Parkway at the Broadway South Exit near 254th Street in Riverdale. Agent Bell testified that this maneuver was accomplished by Townsend cutting sharply across all three lanes of traffic from left to right—apparently, at least to Bell's mind, in an attempt to avoid continued surveillance. By this time, other agents in other cars had joined in the surveillance. From the Broadway South Exit, the Thunderbird turned south on Broadway and proceeded around the block across from Van Cortlandt Park in the vicinity of 252nd Street. Townsend and Currington then drove south on Broadway to 238th Street, where they circled around the area of the Riverdale Diner; it is unclear exactly what ground was covered by Townsend in this maneuver. At any rate, Townsend and Currington finally parked near the Dempsey Dumpsters at the rear of the diner and entered the restaurant without the briefcase. Agent John Maddox (one of those who had joined the surveillance) and his partner followed Currington and Townsend into the diner and watched them sit down and eat lunch, trying unsuccessfully to overhear their conversation.

During the time the two suspects were in the diner, Group Supervisor Jeffrey Hall joined the surveillance team and was apprised of the actions of Currington and Townsend up to that time.[2] After finishing their meal, Currington and Townsend reemerged from the diner, entered the Thunderbird, and drove north on Broadway in the general direction of the Henry Hudson Parkway. This time, however, they stopped at 9621 Broadway (where Townsend had an apartment-office) and parked in the lot at the rear of the apartment building. Bell positioned himself on a side street near the parking lot and observed Currington and Townsend enter the apartment building from the rear, with Currington carrying the briefcase which Bell had previously seen in his possession on West 90th Street. Shortly thereafter, the pair emerged from the building—Currington still carrying the briefcase—and drove away together in the Thunderbird. After entering the Henry Hudson Parkway, Townsend drove east to the Major Deegan Expressway by way of the Mosholu Parkway extension. By this time there were a number of DEA agents positioned in several cars participating in the surveillance. To avoid detection, each car would be the lead surveillance vehicle for a period of time and then drop back for another to take over.[3]

As Townsend's Thunderbird approached the Yankee Stadium exit from the Major Deegan Expressway, it signalled a left turn and immediately veered off, exiting on the right. At the top of the exit ramp, the Thunderbird turned left and then left once again on Jerome Avenue near Macombs Dam Park, heading north. At this point, Group Supervisor Hall, who was in the lead surveillance car, decided to stop the Thunderbird, fearing that otherwise Townsend would lose the surveillance team. Accordingly, he pulled alongside Townsend's vehicle, displayed his identification through the window, and ordered Townsend to pull over. Townsend complied, stopping near

---

**2.** Group Supervisor Hall has been employed by the DEA for ten years and in that time has made approximately 500 arrests.

**3.** Apparently, this is standard surveillance procedure. *See United States v. Tramunti,* 377 F.Supp. 1, 4 (S.D.N.Y.1974). This procedure was also followed when Bell, along with Maddox, followed Currington and Townsend from 96th Street up the West Side Highway to Riverdale.

the curb, and Hall's car stopped slightly ahead and to the left of the Thunderbird. Thereafter, both Townsend and Currington got out of the car, moved to the rear of the passenger side of the Thunderbird, and were engaged in conversation by Hall, who asked Currington if Hall could look in the briefcase. Currington denied any knowledge whatsoever of the briefcase, which at this point was situated on the floor in the back of the Thunderbird behind the passenger seat and was visible through the partially open passenger door.

Townsend, upon being questioned about the briefcase, began backing toward the open passenger door while answering that the agents had him "on the spot," but that he could not in any event allow them to look in the briefcase. Currington at the same time began backing in the opposite direction—away from the officers and the car—saying that he would leave. At this point both Currington and Townsend were arrested.[4] Hall then took the briefcase from the car, opened it, and discovered two paper bags containing plastic bags which, in turn, contained a tan substance later proved by chemical analysis to be heroin.

Later on August 18, 1977, DEA agents searched Townsend's office-apartment at 9621 Broadway and seized a quantity of heroin and cocaine. Although this search was not performed pursuant to a warrant, counsel for the government and Townsend represented to the court that Townsend is not challenging this second search, save insofar as it was the "poisonous fruit" of the prior allegedly improper search of Townsend's car. In addition, Currington's residence at 35 West 90th Street was searched pursuant to a warrant on August 18, 1977, and a briefcase containing personal business papers was seized. This briefcase has since been returned to Currington and he knows of no papers not returned. Nonetheless, he seeks suppression of any possible copies of these papers, claiming that this search also

was the "poisonous fruit" of the first allegedly illegal search.

Defendant Currington called as a witness Agent Maddox and sought to make much of the apparent inconsistencies between his version of the surveillance operation on August 18, 1977, and that testified to by Agent Bell and Group Supervisor Hall. These inconsistencies are not considered by the court to indicate that any of the agents were lying; on the contrary, they are the hallmarks of the truth.

Maddox' sketchy memory regarding the events of August 18, 1977 is largely attributable to the fact that he had been transferred to New York from New Orleans only two or three days prior to August 18. Accordingly, he knew virtually nothing of New York geography or even of New York DEA procedures. Moreover, Maddox' testimony at the instant hearing was preceded by only a glancing reference to reports made shortly after the events in question. When called to testify, Maddox was engaged in closing the purchase of a home in the New York area, which took the time he otherwise might have spent reviewing the facts with fellow agents and reading written reports.

Currington also produced Miss Cheryl Chaney, a friend of Currington, who testified she had been at a neighbor's window to view the availability of tennis courts on August 18 when she saw Townsend's car approach from the 155th Street Bridge. From the neighbor's window, Chaney allegedly saw Hall pull Townsend over, emerge from his car, and talk with Townsend for ten or fifteen minutes while Townsend remained in the car. Chaney further testified that eventually Townsend and Currington got out of the car and one of the agents opened the trunk of the Thunderbird. Chaney claims that shortly thereafter she ran downstairs and outside to observe Currington and Townsend being

---

4. Although Group Supervisor Hall testified that he told Townsend he was under arrest only after the search of the briefcase, the other agents present were not certain whether Townsend was officially put under arrest before or

after the search. In any event, the court finds that Townsend effectively was arrested when Hall told both Currington and Townsend that he would not let them leave.

driven away in separate cars by the DEA agents. Miss Chaney's testimony was at best highly suspect—if not totally incredible.

██ Defendant Townsend took the stand to testify that he did not in any way drive evasively on August 18, or at least he did not do so consciously. What might have been on Townsend's mind cannot be in any way dispositive of the instant motion; the court's task is to reconstruct the factual situation and determine what reasonable agents with these agents' knowledge and in their position would have concluded. *See United States v. Tramunti*, 377 F.Supp. 1 (S.D.N.Y.1974), *aff'd in part*, 513 F.2d 1087 (2d Cir.), *cert. denied* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), and cases cited therein.

*Discussion*

██ The defendants claim that the search of the briefcase was unreasonable since the agents had no probable cause to arrest them. On the contrary, Group Supervisor Hall had ample reason to stop and subsequently to arrest both Currington and Townsend. Both defendants were known by the DEA agents to be major narcotics traffickers, *see United States v. Oates*, 560 F.2d 45, 59–60 (2d Cir. 1977), who had actively been dealing in heroin in recent months. Moreover, they were driving a leased car, a tactic often used by those involved in organized crime activities to avoid seizure and possible forfeiture of the automobile. *See United States v. Tramunti*, 513 F.2d 1087, 1102 (2d Cir. 1975). This knowledge, coupled with the defendants' evasive driving and circuitous routes, gave Hall more than enough reason to stop the Thunderbird, at least for further investigation. *See United States v. Rosario*, 417 F.Supp. 80, 81 (S.D.N.Y.1976). Having stopped Currington and Townsend for questioning, Hall observed highly suspicious behavior that caused him reasonably to believe that a crime was being committed by the two suspects. Most importantly, Cur-

rington vehemently denied any knowledge whatsoever of the briefcase he had been carrying around for several hours. Under these circumstances, the agents had more than a bare suspicion; the facts and circumstances within their knowledge warranted " 'a man of reasonable caution in the belief that' an offense [had] been or [was] being committed." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). *See Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Accordingly, Townsend's and Currington's arrest was wholly proper.

Defendants also charge that, even if their arrest were proper, the search of the briefcase was unreasonable because not incident to the arrest under the recent United States Supreme Court decision of *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). In *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1963), the Supreme Court ruled that police officers may, incident to a lawful arrest, search an individual and the immediately surrounding area in order to protect themselves against possible concealed weapons and to prevent the suspect from destroying evidence. This ruling was reaffirmed in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), where the Supreme Court held that a search was not incident to an arrest from which it was separated by more than an hour.

The instant case is readily distinguishable from *Chadwick*. Whereas in *Chadwick* the suspicious footlocker was locked in the trunk of the suspects' car, here the briefcase was within easy reach of either defendant through the open passenger door; indeed, Townsend was backing toward the briefcase when it was snatched from behind him by Group Supervisor Hall.[5] Moreover, in *Chadwick* the search was separated from the arrest by an hour and a half; here the search was virtually contemporaneous with the arrest of Townsend and Currington.

---

5. Apparently, Miss Chaney's testimony concerning an alleged opening of the Thunder-bird's trunk was a strained effort to bring this case within the scope of *Chadwick*.

Thus, Hall's search of the briefcase was properly incident to the lawful arrest of Townsend and Currington, and the evidence resulting from this search will not be suppressed.[6]

■ The defendants' sole basis for challenge to the searches of Townsend's and Currington's apartments is their claim that these searches were the "fruit" of the prior illegal search of the briefcase. *See Wong Sun v. United States,* 371 U.S. 471, 484–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Since the initial search of the briefcase was entirely legal, this claim is without merit.[7]

■ Finally, Currington has moved in the alternative for either a severance or an order compelling the government to turn over to him a statement allegedly made by Townsend to DEA agents after Townsend's arrest. Currington claims that, not having seen the statement, it is impossible for him to determine whether it is susceptible to redaction as required under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The Court denies this motion without prejudice to its renewal immediately prior to trial, at which time the Court will for the first time look at the statement and decide whether redaction is practicable.[8]

SO ORDERED.

---

**6.** Moreover, Hall's search of the briefcase was reasonable, in any event, because he had probable cause to believe that the briefcase contained contraband involved in a crime. *See Chambers v. Maroney,* 399 U.S. 42, 46–49, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

**7.** As already noted, Townsend is not challenging the warrantless search of his apartment as unreasonable in itself. Currington has no standing to challenge this search even under the liberal automatic standing doctrine, *see United States v. Galante,* 547 F.2d 733, 736–37 (2d Cir. 1976), since he was not present at the search of Townsend's apartment.

**8.** At the hearing on this motion to suppress, there was much ado about Townsend's post-arrest statement. Mr. Feitell, counsel for Currington, protested bitterly his exclusion from a conference held at the Government's request among the court, the Assistant United States Attorney, and counsel for Townsend. As the record shows, however, the minutes of this conference were never withheld from Mr. Feitell, and when he finally requested them, he received them forthwith—to wit, in the afternoon of February 3, 1978. Having digested the minutes of the conference over the weekend, Mr. Feitell reappeared at 10:33 a. m. on February 5, 1978, to renew his lengthy objections to his exclusion from the conference. I have yet to read Townsend's statement or to become involved in any way with its substance.