LEONARD COOPERSTEIN AND ESTATE OF MARCIA COOPERASTEIN, DECEASED, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cooperstein v. Commissioner
Docket No. 6940-77.
United States Tax Court
T.C. Memo 1984-290; 1984 Tax Ct. Memo LEXIS 381; 48 T.C.M. (CCH) 228; T.C.M. (RIA) 84290; June 4, 1984. *381 Held, petitioner received unreported gross income from the sale of silver during 1968 and 1970. Held further, the resultant underpayments of tax were due to fraud and, accordingly, petitioner is liable for an addition to tax under sec. 6653(b), I.R.C. 1954, for each of the years in issue. David K. Shuffman, for the petitioners. Patrick E. Whelan, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: In his notice of deficiency dated April 7, 1977, respondent *382 determined the following deficiencies in and additions to petitioners' Federal income taxes: Addition to tax pursuant
Year
Deficiency
to sec. 6653(b) [1]
1968
$148,183.91
$74,091.96
1970
15,054.26
7,527.13
The issues presented for our decision are: (1) whether Leonard Cooperation (hereinafter referred to singularly as petitioner) received unreported gross income from Edward B. McAlpine, Refiners of Precious Metals, during 1968 using the alias, Jack Lazaar, and whether he received unreported gross income from the same source during 1970, trading as Lee Lee Coins; and (2) whether, if we find that petitioner received such unreported income, any part of the resultant underpayment of taxes for either 1968 or 1970 was due to fraud. FINDINGS OF FACT This case was submitted to the Court without a stipulation of facts. Leonard Cooperstein was a resident of Cranford, New Jersey at the time he filed the petition herein. *383 Leonard Cooperstein and Marcia Cooperstein (hereinafter referred to collectively as petitioners) were husband and wife until the death of Marcia Cooperstein on February 7, 1975. Leonard Cooperstein executed and filed an "Affidavit of Surviving Spouse," pursuant to which he is entitled to act as a duly appointed administrator of the Estate of Marcia Cooperstein. Petitioners filed their joint Federal income tax returns for 1968 and 1970 which the Office of the Internal Revenue at Philadelphia, Pennsylvania. On their joint income tax return for 1968, petitioners reported total income of $8,143.50. The schedule C, "Profit (or Loss) from Business or Profession," attached to the 1968 return reflects gross receipts of $76,258, cost of goods sold of $67,393, and gross profit of $8,865. On their joint income tax return for 1970, petitioners reported total income of $8,686. The schedule C attached to the 1970 return reflects gross receipts of $22,772, cost of goods sold of $17,301, and gross profit of $5,471. In the early 1970's Postal Inspector Eric Larson became involved in an investigation of matters emanating from the affairs to Edward B. McAlpine, Refiners of Precious Metals *384 (hereinafter referred to as McAlpine), located in Providence, Rhode Island. During the same period of time, Revenue Agent Lee Bailey was investigating affairs emanating from the business operations of McAlpine. Bailey began his investigation after he came into possession of a series of substantial checks drawn by McAlpine to the order of Jack Lazaar, doing business as Jersey Trading Co., and to Lee Lee Coins. Larson and Bailey cooperated in a joint investigation of the McAlpine affairs. Although they pursued various avenues of inquiry, Larson and Bailey were unable to establish that there existed an actual individual named Jack Lazaar. They did, however, establish that petitioner operated Lee Lee Coins Numismatics, with a business address of 372 South Orange Avenue, Newark, New Jersey. In the course of pursuing the identity of Jack Lazaar, Larson, in 1971, conducted separate interviews of four McAlpine employees, Virginia Dygd, Howard Sutton, Hilda Marie Banks, and Alan D. Dexter. Prior to the interviews, Larson assembled ten photographs of different individuals to make up a photograph spread. Included within the group of photographs was a photograph of petitioner. During *385 the interview of each employee, Larson displayed the ten photographs in a group and asked each employee, "Can you identify Jack Lazaar?" Each of the four employees unequivocally identified the photograph of petitioner as being a photograph of Jack Lazaar. Larson asked each of the identifying employees to initial and date the reverse side of the photograph selected as Jack Lazaar. Agent Bailey used the cancelled checks in his possession as a basis for formulating the deficiencies asserted herein. Twenty of the cancelled checks were drawn by McAlpine in the year 1968 and made payable to the order of Jack Lazaar, doing business as Jersey Trading Co. None of the 1968 checks were drawn to the order of Lee Lee Coins. The 1968 checks were drawn on either the Industrial National Bank, Providence, Rhode Island or the Rhode Island Hospital Trust Company. Three of the cancelled checks were drawn by McAlpine in the year 1970 and made payable to the order of Lee Lee Coins. None of the 1970 checks were drawn to the order of Jack Lazaar. The 1970 checks were drawn on the Industrial National Bank. In addition, Bailey procured copies of Rhode Island Hospital Trust National Bank debit advice *386 memos, reflecting charges to McAlpine's account for funds transferred to Lee Lee Coins. One of the memos reflected a date of December 31, 1969 and a second, a date of January 30, 1970. Bailey determined, based on a thorough examination of McAlpine's accounts payable ledger and other McAlpine documents, including invoices, that the checks in question, as well as the transactions recorded in the bank debit memos, represented McAlpine's payment for the purchase of materials or merchandise from Lazaar or Lee Lee Coins.
Bailey then drew up a schedule, from which the deficiencies herein were derived, representing a summary of his conclusions. By this point Bailey had concluded that petitioner and Lazaar were one and the same. With respect to the year 1968, Bailey concluded that one of the 20 checks drawn to Lazaar was returned to McAlpine for a replacement check. Since it appeared that petitioner, as Lazaar, never received any benefit from the funds of the first check, Bailey eliminated it from his schedule, thereby leaving 19 checks chargeable to petitioner in the total amount of $418,684.82 for the sale of goods to McAlpine. With respect to the year 1970, Bailey concluded that *387 the three cancelled checks drawn to Lee Lee Coins in the amounts of $15,000, $12,000, and $4,000, as well as the transaction reflected in the January 30, 1970 bank debit memo in the amount of $12,267.81 were properly chargeable to petitioner, doing business as Lee Lee Coins, for the sale of goods to McAlpine. Bailey's schedule also included a $20,000 item in the 1970 receipts. Presumably this item was taken from the December 31, 1969 bank debit memo. Bailey's overall investigation of petitioner included the year 1969, as well as the years 1968 and 1970. Although the year 1969 is not before this Court, one of Bailey's discoveries with respect to a 1969 check has significance. The check in question was drawn on November 7, 1969, and made payable to Lazaar, in the amount of $23,401.23. This check was not reflected in McAlpine's accounts payable ledger for either Jack Lazaar, doing business as Jersey Trading Co., or Lee Lee Coins. However, reference is made to a $23,401.23 check in a letter mailed to McAlpine from petitioner's business address, 372 S. Orange Avenue, Newark, New Jersey, dated December 26, 1969. The letter appears to be a settlement of a running account. A brief *388 message thereon is followed by the typewritten name, "Jack." Toward the bottom of the letter, the name "Jack Lazaar" and the notation, "Mdse." are written in pencil next to an item of "monies received." The item in question is in the amount of $23,401.23 and a November receipt date is noted. Bailey concluded that this item reflected receipt of the cancelled check drawn to Lazaar on November 7, 1969. In addition to the $23,401.23 item, the letter specifically refers to three other items of "monies received." the dates and amounts of these three items correspond to the dates and amounts of two 1969 cancelled checks made payable to Lee Lee Coins and a 1969 debit advice memo reflecting a transfer of funds to Lee Lee Coins. Bailey's examination disclosed that there was a well-defined pettern in the negotiation of McAlpine Checks made payable to Lazaar. The checks were occasionally cashed, but usually negotiated through third parties in New York, Switzerland, or South America. Bailey attempted to trace the proceeds of these checks, but his efforts proved unsuccessful due to the fact that the ultimate receipients of most of the checks were overseas individuals or bank accounts. *389 Bailey also made a comparison between bank deposits to the account of Lee Lee Coins and the checks made payable by McAlpine to Lee Lee Coins and found that the total amount represented by the cancelled checks substantially exceeded actual total deposits. When he was initially interviewed by Bailey, petitioner denial all knowledge of Lazaar and did not recall having any business dealings with McAlpine. However, when petitioner was shown a McAlpine check payable to Lee Lee Coins in the amount of $30,000, he recalled a one-time transaction with McAlpine. When questioned about his books and records, petitioner represented that his business records had been destroyed by the new owner of a building in which the records had been kept and that his personal records had been destroyed in a flood. Petitioner represented to Bailey that all checks from McAlpine to Lee Lee Coins were deposited into the bank account for Lee Lee Coins and that the total deposits would equal the amount reported on his income tax return. Bailey's examination did not bear petitioner out in this regard; in fact, the checks substantially exceeded the deposits. During the trial of this case, respondent presented *390 as witnesses the four McAlpine employees who had identified petitioner's photograph as being a photograph of Lazaar. Each witness confirmed the photograph identification procedure conducted by Larson, once again selected the photograph of petitioner as being a photograph of Lazaar, and the identified his or her initials on the backside of the photograph. These witnesses held various employment positions at McAlpine during the years in question. Virginia Dygd was primarily responsible for "answering the window." In describing that function, Dygd explained that the front door at McAlpine was locked at all times. All persons seeking entry to McAlpine had to identify themselves to Dygd at a small window she manned. Dygd stated that during the years 1968 through 1970, she became acquainted with a person named Jack Lazaar, who was associated with Jersey Trading and Lee Lee Coins. Each time Lazaar came to the window at McAlpine it was necessary for him to state his name and business. After Lazaar was admitted through the front door of the McAlpine building, Dygd wwould call to the other end of the building with the message that Lazaar had precious metals to deliver. Usually, Dygd *391 would call Howard Sutton's phone to announce the delivery. Sutton's functions included receiving and weighing bullion or whatever other material came into McAlpine. Sutton testified that he became acquainted with Lazaar in the process of unloading material delivered by Lazaar. After Sutton weighed materials received, he would convey the pertinent information to personnel in the office at McAlpine, typically to Hilda Marie Banks. Among Banks' duties was the preparation of financial records, invoices, and checks. When a shipment of scrap material was received by McAlpine, Banks would type up an invoice setting forth information relating to the shipment and corresponding check. The check number would be typed on the invoice. Banks verified that the cancelled checks and invoices used by Bailey as a basis for formulating the deficiencies herein represented business records of McAlpine reflecting McAlpine's purchase of materials. Alan D. Dexter was Operations Manager for McAlpine during the years in question. He testified that during that period he came to know a person by the name of Jack Lazaar. During the trial, Dygd and Sutton identified petitioner as the person they recalled *392 to be Jack Lazaar. Dexter identified petitioner as bearing a strong resemblance to the person he recalled to be Jack Lazaar. Banks stated that she could not make a positive identification after 12 years. Petitioner's testimony throughout the rather protracted proceedings in this case was confusing, at best. Notwithstanding the fact that he initially represented to Bailey that he never knew a Jack Lazaar, petitioner testified that he was approached several years ago in his mother's liquor store, next to which he operated a coin shop, by a gentleman who gave his name as Jack Lazaar. Lazaar made arrangements to have petitioner transport silver to McAlpine. Lazaar, in return, would pay petitioner $200 per trip. Petitioner's testimony progressed as follows (questions by the Court, answers by petitioner): Q. Did you know this man before? A. Never met him before. Q. Didn't you think it strange this man, a total stranger, was going to come to you and offer to pay you money to take bars of silver to Providence? A. Strange in what respect? He was paying me for a service that he couldn't possibly do. * * * Q. Well, weren't you surprised? I mean, why did he pick you? *393 Didn't that occur to you?
A. Let me ask, if he picked another person and another person went, why did he pick him? * * * Q. Where is Jack Lazaar? A. I heard he was dead. But I really don't know. Because I don't knew -- The man used to come and drop the material off and -- Q. When was the last time you saw him?
A. 1969. Never had a telephone of his to get in touch with him. Never had access to where he did, what he did, residence, place. Q. What did he look like? * * * A. Five, two-and-a-half. Much shorter than I am, Your Honor. Petitioner further explained that Lazaar discontinued the operation in 1969, at which time petitioner entered into a partnership with George Maglaras of G.M. Coins. Petitioner agreed to supply the monies needed to purchase materials for sale to McAlpine and Maglaras agreed to buy the materials. Maglaras would also supply the services, because in petitioner's words, "I was unable to deliver the material." Petitioner and Maglaras agreed to divide the profits equally, and pursuant to this agreement, petitioner explained that he reported on his returns one-half of the sales receipts. When questioned with respect to the whereabouts *394 of Maglaras, petitioner was able to reveal only that he lived somewhere in Clearwater, Florida. On the basis of the following colloquy, the Court, at the conclusion of the second day of trial, continued the trial to a future date for further proceedings.
MR. COOPERSTEIN: Your Honor, in the interviewing of the four employees each of them stated that only Mr. Cooperstein as Jack Lazaar came forth and nobody else. Now, if there are other people who came forth and uttered the words that I say they uttered, "For Jack Lazaar," which I uttered as well.But the terminology doesn't necessarily imply that I am Jack Lazaar, but I am the messenger for Jack Lazaar, which is the point that I am trying to bring across: that I am not Jack Lazaar. * * * And if given an opportunity I can bring forth four witnesses all totalled to state the facts there were other people; and all uttering the same thing: "For Jack Lazaar." THE COURT: Well, that would not necessarily contradict what the employees said. I don't know how much help that would be unless these four individuals said, we know an individual by the name of Jack Lazaar who is not Leonard Cooperstein, and I went to the silver company and said *395 I am here for Jack Lazaar. If they would testify to that it would be of help to you. MR. COOPERSTEIN: I will have these people come in and utter these same things. I will bring forth the four witnesses I intend. THE COURT: And you say that they know a Jack Lazaar and you are not Jack Lazaar. MR. COOPERSTEIN: They will say that I was not Jack Lazaar. And they don't know him, on more so than I know him, but have met him. THE COURT: They [will] say they * * * have met someone who represented himself as being Jack Lazaar? MR. COOPERSTEIN: Yes. THE COURT: And that man is not you? MR. COOPERSTEIN: Yes. MR. WHELAN: At the risk of being repetitive, Your Honor, I have told Mr. Cooperstein since 1978 if he wanted to bring in any evidence that there is a real Jack Lazaar I would be certainly willing to entertain it. THE COURT: * * * I think the thing to do is to set this case at 10:00 o'clock June 15. * * * THE COURT: * * * And you had better have those witnesses here, Mr. Cooperstein. * * * THE COURT: And they had better say what you say they are going to say or else your credibility with this Court will be zero. MR. COOPERSTEIN: Let me ask you *396 a question, Your Honor. They will say that they made deliveries to McAlpine Refinery. They will also state that to their knowledge that I am not Jack Lazaar. THE COURT: Will they say to their knowledge that they have met someone, another human being, who represented himself as Jack Lazaar? MR. WHELAN: Your Honor, may we have the names, addresses and telephone numbers of these individuals right now? * * * MR. COOPERSTEIN: George Maglaras in Clearwater, Florida. A Charlie Seals -- Sheilds, S-H-E-I-L-D-S, Clearwater, Florida. Mr. Jack Seals, Newark, New Jersey. And his wife, Dorothy Seals * * *. * * * MR. WHELAN: May I confirm my understanding that these people will testify that there is a Jack Lazaar and that you are not Jack Lazaar? MR. COOPERSTEIN: They will testify to the fact that to the best of their knowledge that I was a representative of Jack Lazaar but not Jack Lazaar. THE COURT: Well, that's not quite the -- You're dancing around a little bit. MR. COOPERSTEIN: * * * They will say that I am not Jack Lazaar and that Jack Lazaar does exist.
THE COURT: And they will say that they have met someone else who represented himself to be Jack Lazaar? You *397 have answered that question twice affirmatively, I believe. MR. COOPERSTEIN: Yes. Yes. * * * MR. WHELAN: They will tell us where we can locate Jack Lazaar? MR. COOPERSTEIN: How would they know? * * * Now, they cannot, no more so than I can, tell you where this person lives and exists. Because if they could then I could. And I would tell. Petitioner had a different story to tell the Court when proceedings resumed. Petitioner revealed for the first time that the real Jack Lazaar is Jack Rubin, an international diamond dealer, who trades under the name of Jay Howard, located at 62 West 47th Street in New York City. On the fourth day of trial petitioner brought in telephone directories for 1969 and 1970 to buttress his story and proceeded to relay the directory listing for Jack Rubin -- "Jack Rubin Diamonds, 62 West 47th Street, Jutson 6-2278 or Jutson 6-1622. J. Howard, Incorporated, 62 West 47th, Jutson 6-2778 and Jutson 6-1622." Petitioner explained that he had not come forward in previous years with the real identity of Jack Lazaar because he was in fear of his life. According to petitioner's new testimony, Rubin hired petitioner to arrange deliveries *398 of silver to McAlpine, in return for which Rubin would pay petitioner $200 per delivery. Petitioner denied ever making deliveries himself; rather, he recruited others, including Jack Seals, to make the deliveries. Petitioner testified that he visited McAlpine only when there were problems with bouncing checks. He further testified that he turned over to Rubin all of the McAlpine checks made to Lazaar. Robin would then call in his secretary, Harriet, to endorse the checks. According to petitioner, Harriet is still employed at 62 West 47th Street, where she now works for Murray Jewelers, which is run by Jack Rubin's son and an associate. Petitioner testified that Jack Rubin would not testify as a witness because petitioner did not know where to find him. Petitioner gave no explanation for failing to call Harriet to the stand. [2]
Petitioner presented two of the four promised witnesses, Jack Seals and George Maglaras. Seals testified that in the late 1960's he was employed by petitioner to make deliveries of silver bars to *399 McAlpine Refinery.In return, petitioner paid Seals $200 for each delivery. Seals testified that he never knew Jack Lazaar. He had, however, met a Jack Rubin, whom he described as "a small man, partly bald, and a little on the heavy side at the time." Maglaras verified that there was some sort of unofficial partnership between himself, doing business as G.M. Coins, and petitioner during 1969 and 1970. The agreement made was that petitioner would supply all the money for silver purchases, Maglaras would make the purchases, and petitioner and Maglaras would split the profits derived from sales of the silver. According to Maglaras' testimony, there were a number of joint venture transactions; however, only five of the transactions involved sales to McAlpine. Out of the five transactions involving sales to McAlpine, apparently only two were consummated in 1970, the other three being consummated in 1969. Maglaras produced two invoices reflecting deliveries of silver to McAlpine in 1970. The first invoice, dated January 2, 1970, shows a total cost of goods sold of $31,106.58, total received from McAlpine of $31,308, total profit of $191.42, and receipt by G.M. Coins of $95.71. The *400 second invoice, dated January 23, 1970, shows a total cost of goods sold of $8,209.18 total received from McAlpine of $9,000, total profit of $790.82, and receipt by G.M. Coins of $395.42. Maglaras testified that he never knew a Jack Lazaar. He had, however, met Jack Rubin, whom he described as "a small person, maybe a little over five, and at the time I knew him he was medium weight * * *." Maglaras was unaware of the nature of any business between petitioner and Rubin. OPINION Issue 1. The Deficiencies.
[3]
1968 Year
Respondent arrived at the deficiency for 1968 by increasing petitioners' income by the total amount of gross receipts *401 represented in 19 McAlpine checks payable to Jack Lazaar during the 1968 year. To prevent any possible duplication, he then subtracted out gross receipts actually reported on schedule C attached to the 1968 return before calculating the additional tax allegedly due. The correctness of the 1968 deficiency determination obviously depends, in large measure, on whether petitioner is Jack Lazaar. Based on the evidence in the record and our observations at the trial, we conclude, as has respondent, that petitioner is Jack Lazaar. Petitioner's highly incredible tales did not overcome the adverse testimony of four impartial witnesses. Judges are charged with the responsibility of determining credibility of witnesses because our court system recognizes that the signs of credibility are more than just those found in a cold record. * * * [Cooperstein's] testimony is, in and of itself, inherently incredible. It is clear that he changed his story from time to time as it suited him; but * * * [the] conclusion as to his credibility is dictated not only by these factors but by watching a man of supreme ego attempting to toy with the truth and with our court system. * * * [United States v. Tramunti,377 F.Supp. 1 (S.D.N.Y. 1974).] *402 When petitioner initially was interviewed by Revenue Agent Bailey, he denied any knowledge of a Jack Lazaar. By the time trial commenced, petitioner admitted that he had worked for a Jack Lazaar, but that he did not know where Jack Lazaar could be located, stating that Lazaar "[n]ever had a telephone of his to get in touch with him. Never had access to where he did, what he did, residence, place." By the third day of trial, however, petitioner testified that Jack Lazaar is in reality Jack Rubin, an international diamond dealer, and by the fourth day of trial, petitioner was prepared to advise the Court of Rubin's telephone listing in 1969 and 1970. Faced with these patent inconsistencies we find it difficult indeed to credit any truth to petitioner's testimony. As if the foregoing testimony were not enough sufficiently to damage petitioner's credibility, petitioner persisted in his own self-contradictions. At one point he testified that Lazaar paid him $200 for each delivery he made to McAlpine. Later, he altogether denied making any deliveries to McAlpine, despite Dygd's testimony that she admitted petitioner to McAlpine for deliveries and Sutton's testimony that he helped *403 petitioner unload deliveries. Petitioner's last in a series of shifting explanations was that he visited McAlpine only when there were problems with bouncing checks. Petitioner's credibility dropped a little lower in our estimation when, after testifying that Lazaar hired him to make deliveries to McAlpine in return for $200 each trip, he testified that Maglaras made the partnership deliveries because petitioner "was unable to deliver the material." Further, we are left to wonder what petitioner could have hoped to gain from his alleged arrangement with Lazaar in light of the fact that he apparently paid Seals $200 for each delivery to McAlpine. Petitioner stated that he was not calling Jack Rubin as a witness because he did not know where to find him. However, according to petitioner's testimony, Jack Rubin's son and Jack Rubin's former secretary, Harriet, worked down the street from petitioner's business address. We can discern no apparent reason why petitioner failed to call Harriet as a witness to corroborate his new line of testimony that he turned all McAlpine checks drawn to Jack Lazaar over to Jack Rubin and that Harriet endorsed those checks with the name Jack Lazaar. *404 Finally, we cannot ignore the fact that petitioner repeatedly assured this Court that, if given the chance, he would produce four witnesses who would testify that they knew Lazaar and and that petitioner and Lazaar were not one and the same.In the interest of getting the full story out on the table and of giving petitioner every opportunity to come forth with evidence supporting his case, this Court continued the trial. Petitioner, in return, presented two of the four promised witnesses, neither of whose testimony was supportive of petitioner's story insofar as it related to the identity of Jack Lazaar. The record is replete with similar demonstrations of petitioner's lack of veracity. Accordingly, we are unable to credit more than mimimal weight to his testimony.Respondent, on the other hand, presented four impartial witnesses to support respondent's position that petitioner is Jack Lazaar and a copy of a letter from petitioner's business address which, on its face, appears to link petitioner to Jack Lazaar.Under the circumstances, we believe that respondent's evidence clearly demonstrates that petitioner used the alias "Jack Lazaar" in his dealings with McAlpine. The records *405 McAlpine place gross receipts of $418,684.82 in Lazaar's hands for the 1968 year. Accordingly, since we find that Lazaar and petitioner are one and the same, we further find that petitioner received $418,684.82 from McAlpine in 1968. Petitioner argues, somewhat characteristically, that even assuming, arguendo, he is Jack Lazaar there is still no tax due and owing for the 1968 taxable year. Petitioner's theory is that his cost of goods sold, together with a loss carryback to which he should be entitled as a result of two McAlpine checks being dishonored in 1969, reduce any 1968 tax liablity to zero. Petitioner seeks to establish his cost of goods sold through copies of the "Coin Dealer Newsletter" published in October, November, and December of 1968. Suffice it to say that we are not going to accept these publications as evidence of "Jack Lazaar's" cost of doing business. Moreover, although it is clear from the record that two McAlpine checks drawn in 1969 and made payable to Lee Lee Coins were dishonored, there is nothing in the record to support a finding of a deductible loss, let alone a loss carryback. We realize that it may appear harsh to sustain a deficiency based *406 on gross receipts, but once the Commissioner, in establishing the applicability of section 6501(c)(1), establishes by clear and convincing evidence unexplained receipts, and thus an underpayment, the burden then shifts to the taxpayer of coming forward with evidence with respect to the amount of offsetting expenses, if any. [4] Petitioner has failed to come forward with credible evidence to support a reduction in the unreported receipts. Accordingly, we sustain respondent's determination of the 1968 deficiency. 1970 Taxable Year
In arriving at the deficiency for 1970, respondent determined that petitioner, doing business as Lee Lee Coins, had unreported gross receipts from sales to McAlpine in the amount of $63,267.81. The schedule used in formulating the deficiency reflects the composition of the $63,267.81 figure to be as follows: Date
Check No.
Amount
1/1/70
$20,000.00
1/2/70
57513
15,000.00
1/2/70
57514
12,000.00
1/23/70
57637
4,000.00
1/30/70
Bank debit advice
12,267.81
In order to avoid any possible duplications, respondent *407 reduced the $63,267.81 figure by $22,772 gross receipts reflected on the schedule C attached to petitioner's 1970 return before calculating the additional tax. It is not entirely clear from the record how respondent arrived at the January 1, 1970 entry. Apparently it is based on a Rhode Island Hospital Trust National Bank debit advice memo, dated December 31, 1969, indicating a charge to McAlpine's account for "funds transferred to Lee Lee Coin Co." in the amount of $20,000. We do not know whether the January 1, 1970 entry date was a mistake or whether it was made pursuant to respondent's determination that petitioner received the funds on January 1, 1970. In the absence of any illuminating testimony with respect to the matter and in view of the December 31, 1969 date on the debit advice memo, we believe that the item must be removed from the computation of the 1970 deficiency. We further believe that petitioner, through Maglaras, presented sufficient evidence to require a reduction in the two January 2, 1970 entries. We base our conclusion that a reduction is necessary on an overall examination and comparison of the pertinent McAlpine documents, the cancelled checks, and *408 the G.M. Coins invoice dated January 2, 1970. The invoice in question roughly, though not precisely, corresponds to the McAlpine documents underlying the issuance of the two January 2, 1970 checks. It reflects a sale of silver, U.S. silver coins, and Canadian silver coins to McAlpine in the amount of $31,308.58, for a total profit of $161.42, with G.M. Coins receiving one-half of the profit, or $95.71. McAlpine documents, dated January 2, 1970, indicate a purchase of "Silver," "US," "Canadian" in the total amount of $31,386.56 and the issuance therefor of check No. 57513 and check No. 57514 to Lee Lee Coins in the respective amounts of $15,000 and $12,000, with a balance owed of $4,386.56. We believe that the information recorded on the G.M. Coins invoice, when considered in conjunction with Maglaras' testimony, serves to establish petitioner's cost of goods sold, his gross receipts, and his share of the profit on the January 2, 1970 sale.Specifically, we Conclude that petitioner should be charged with having received one-half of the gross receipts represented by the two cancelled checks, that is, $7,500 from check No. 57513 and $6,000 from check No. 57514. We further conclude *409 that petitioner made an overall profit on the January 2, 1970 sale of $95.71. Respondent's January 23, 1970 entry in the amount of $4,000 corresponds to the G.M. Coins invoice of the same date. The invoice reflects a sale of mixed silver to McAlpine in the total amount of $9,000 for a total profit of $790.82, with G.M. Coins receiving one-half of the profit, or $395.42. McAlpine documents, dated January 23, 1970, indicate a purchase of mixed silver scrap in the total amount of $9,000 and the issuance therefor of check No. 57637 to Lee Lee Coins in the amount of $4,000 and a second check to Maglaras in the amount of $5,000. Based on an overall examination of all of the relevant documents, we conclude that petitioner received gross receipts in the amount of $4,000 on the January 23, 1970 transaction; however, petitioner's profit on the sale was only $395.42. Respondent's January 30, 1970 entry in the amount of $12,267.81 was derived from a debit advice memo of the same date reflecting a charge to McAlpine's account for funds transferred to Lee Lee Coins. Petitioner has not presented any credible evidence that he received only one-half of the gross receipts from the January 30, 1970 sale *410 by virtue of his partnership arrangement with Maglaras. Although Maglaras verified that he and petitioner engaged in several joint venture transactions buring 1969 and 1970, he testified that there were only five joint venture sales to McAlpine. We have concluded that only two of the five joint venture sales to McAlpine occurred in 1970, the two sales discussed above. Accordingly, petitioner is appropriately charged with having received gross receipts in the entire entire amount of $12,267.81 from the January 30, 1970 sale. Our conclusions thus far with respect to petitioner's 1970 gross receipts and profits can be summarized as follows: Date
Check No.
Gross Receipts
Profit
1/2/70
57513
$ 7,500.00
$ 95.71
1/2/70
57514
6,000.00
1/23/70
57637
4,000.00
395.42
1/30/70
Bank debit advice
12,267.81
$29,767.81
$ 491.13
The schedule C attached to petitioner's 1970 return reflects gross receipts of $22,772. Thus, since we have concluded that petitioner received gross receipts in the total amount of $29,767.81, it follows that petitioner underreported his gross receipts by $6,995.81. Petitioner has presented no evidence of his cost of *411 goods sold to support a reduction in the excess gross receipts. Accordingly, we will consider the entire $6,995.81 as representing not only gross receipts, but also profit. Thus, we conclude that petitioner received total gross profit of $7,486.94, comprised of the foregoing figure in the amount of $6,995.81 and the $491.13 profit figure from the two joint venture sales. The schedule C attached to petitioner's 1970 return reflects gross business profit of $5,471. Thus, since we have concluded that petitioner received gross profit in the total amount of $7,468.94, it follows that petitioner underreported his gross profit by $1,197.94. Accordingly, the deficiency for 1970 must be recomputed in light of our conclusion herein. [5]
*412 Issue 2. Additions to Tax for Fraud.
The second issue for consideration is whether any part of the 1968 and 1970 underpayments was due to fraud within the meaning of section 6653(b). Fraud, for purposes of section 6653(b), has been defined as an intentional wrongdoing with the specific intent to evade a tax believed to be due and owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958). Respondent has the burden of proving, by clear and convincing evidence, that some part of the underpayment was due to fraud. See. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. Without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed; rather, it must be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, *413 be proved by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commisisoner,53 T.C. 96, 105-106 (1969). After considering all of the evidence, we are convinced that petitioner engaged in a course of conduct intended to conceal his taxable income for 1968 and 1970 and to evade a tax known to be owing. Since petitioner steadfastly denied his identity as Jack Lazaar, it is reasonable to assume that he did not report any income from McAlpine attributable to Jack Lazaar. At any rate, the $76,258 gross receipts reported by petitioner on his 1968 return fall far short of the $418,684.82 gross receipts placed in "Lazaar's" hands by McAlpine's business records and cancelled checks. Aside from this substantial understatement of gross receipts, petitioner attempted to conceal the income here by using an alias and negotiating checks in an unorthodox manner, which effectively precluded tracing their proceeds. Similarly, although the redetermined understatement for 1970 *414 is relatively minimal in comparsion to the 1968 understatement, we nonetheless are convinced that the understatement is attributable to fraud. We view petitioner's consistent pattern of making false statements and his utter failure to cooperate with respondent, in general, throughout the administrative phase of this case as substantial evidence of fraudulent intent. In short, petitioner's conduct throughout the entire audit and trial is indicative of an intent to evade income taxes. [6]
Having concluded that a part of the 1968 and 1970 underpayments of tax was due to fraud, we further conclude that petitioner is liable for an addition to tax under section 6653(b) for each of the years in issue. The addition to tax for 1970 is to be recomputed in light of our decision requiring an adjustment in the 1970 deficiency. Decision will be entered under Rule 155.
Footnotes
1. Respondent has determined that no part of the alleged underpayment of tax was due to fraud on the part of Marcia Cooperstein and, accordingly, seeks to impose the sec. 6653(b)↩ addition to tax against Leonard Cooperstein alone.
2. We note that petitioner's business address for the 5 years preceding trial was within 4 numbers of rubin's and Harriet's given business addresses.↩
3. Aside from disputing the correctness of the deficiencies, petitioner contends that the 3-year statute of limitations bars the assessment and collection of deficiencies for 1968 and 1970, in any event. In view of our holdings with respect to the deficiency and fraud issues, the exception to the statute of limitations provided in sec. 6501(c)(1) applies so that the tax may be assessed "at any time." We need not address respondent's alternative contention that the 1970 deficiency may be assessed pursuant to sec. 6501(e)(1).↩
4. See Bourque v. Commissioner,T.C. Memo. 1980-286↩, and the cases cited therein.
5. The evidence in the record, when taken as a whole, suggests to us that petitioner may well have received substantially more income in an unknown amount during 1970 than the amount we have taken into account. However, respondent's computations were proved defective, in part, at trial. Thus, we are left with the difficult task of reconciling the evidence produced with respondent's notice of deficiency, and we believe that the decision reached is the only one which can be reached with any degree of certainty based on the record before us.↩
6. Cf. Sherman v. Commissioner,T.C. Memo. 1977-261↩.