UNITED STATES of America,

v.

Alvaro ROJAS, Amado Cardona, and
Frank Parra, Defendants.

No. CR–87–00002.

United States District Court,
E.D. New York.

March 12, 1987.

1158

Jerald Levine, Jackson Heights, N.Y., for defendant Rojas.

Gary Schoer, Garden City, N.Y., for defendant Cardona.

Barry E. Schulman, Brooklyn, N.Y., for defendant Parra.

Andrew J. Maloney, U.S. Atty., E.D.N.Y. by Catherine Palmer, Asst. U.S. Atty., for U.S.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

Defendants, Alvaro Rojas, Amado Cardona and Frank Parra, have been indicted for possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and for conspiracy to do the same in violation of 21 U.S.C. § 846. The charges arise from defendants' arrest on December 17, 1986, at which time 60 kilograms of cocaine were seized. All three defendants have moved on various grounds to suppress tangible evidence and statements obtained from them at the time of and subsequent to their arrest. In addition, defendant Parra moves for severance of his trial from that of his co-defendants. For the reasons stated below, defendants' motions to suppress are granted in part and denied in part. Defendant Parra's motion for severance is denied without prejudice to its renewal in the event the prosecution seeks to use against his co-defendants at a joint trial evidence suppressed as to him. What follows sets forth this Court's

findings of fact made following a hearing as required by Rule 12 of the Federal Rules of Criminal Procedure.

On December 17, 1986, at approximately 5:15 p.m., Detective Dennis Casey and Special Agent Jerome McArdle, members of the New York Drug Enforcement Task Force, commenced surveillance in two separate undercover vehicles of a house located at 100–14 Spruce Avenue in Queens. The surveillance was part of an ongoing investigation of cocaine trafficking. The officers were led to the house at Spruce Avenue by information received from official reports that telephone calls had been placed between a telephone listed in the name of Teresa Rojas, sister of the defendant Rojas, at Spruce Avenue and the residence in Staten Island of a Fernando Ferrara. Ferrara, the officers were aware, had been charged with violations of the narcotics laws in connection with the operation of a clandestine lab for the refining of cocaine on Long Island and was a fugitive in that case. The last calls from Ferrara's residence dated from July 1986, when Ferrara's phone had been disconnected.

At approximately 5:50 p.m., one of the agents observed two Hispanic males get into a 1982 Chevrolet parked in the driveway of the Spruce Avenue address. The officers subsequently identified the driver of the car as defendant Rojas and the passenger as defendant Cardona.

Rojas and Cardona, followed by Agent Casey, drove approximately five blocks to a pay telephone on which Rojas was seen to speak to an unidentified person for approximately ten minutes. Both agents were aware at the time, as a result of tracing the Ferrara connection to the house on Spruce Avenue, that there was an operating telephone in the house that defendants had just left.

After finishing the call, Rojas and Cardona drove to the vicinity of Francis Lewis Boulevard and Weeks Lane also in Queens, followed by both agents in separate cars. Upon arriving in this neighborhood, defendants began to drive as if to avoid or detect surveillance. Within a ten-block area, the agents observed defendants make numerous U-turns, repeatedly circling the same blocks, proceed at an extremely slow speed, and on several occasions pull onto Weeks Lane, shut off the car's headlights, and then after a short interval turn them on again and continue to drive in the same erratic manner. This driving pattern continued for approximately fifteen minutes.

At approximately 6:30 p.m., Rojas and Cardona drove onto Weeks Lane, again extinguished the car's headlights and waited. Shortly thereafter, an Oldsmobile, driven by an individual subsequently identified as defendant Parra, approached the car occupied by Rojas and Cardona. As Parra drove by, he signaled for Rojas and Cardona to follow him, which they did, to the corner of 47th Avenue and 102nd Street in Queens. Both vehicles then pulled to the side of the road, one behind the other, in a darkened area where the three defendants got out of the cars and opened the trunk compartments of both vehicles.

Both agents then observed defendants remove three pieces of luggage from the trunk of Parra's car and place two of the pieces of luggage in the trunk of the Rojas-Cardona Chevrolet. The two officers, still in two separate cars, then drove up behind the two stopped vehicles, exited their cars, identified themselves as police officers, and approached the three men with guns drawn.

The defendant Parra reacted to their approach by running, attempting to hide under his car and discarding an electronic beeper. Each of the three defendants were then arrested and directed to lie on the ground. Parra was handcuffed by Agent Casey. Agent McArdle did not attempt to handcuff the other two defendants until after the arrival of other law enforcement officers in response to Agent Casey's radio call for assistance.

Agent McArdle then advised the three defendants of their *Miranda* rights. Defendants Rojas and Parra advised McArdle that they understood their rights, but Rojas told the agent that Cardona only understood Spanish. At the request of the agent, Rojas then interpreted the *Miranda* warnings into Spanish as McArdle repeated

them. Cardona then stated that he understood his rights.

McArdle then asked Rojas if he was the owner of the suitcase he had been carrying and had dropped as the agents approached in the roadway. Rojas disclaimed ownership of the suitcase or knowledge of its contents, except to say that he believed it contained something illegal. In response to further questions, Rojas stated that he was going to place a phone call to learn what he was to do with the suitcase after he had received it. At that point, exercising his rights under *Miranda,* Rojas declined to make any further statements.

Prior to the questioning, McArdle patted down each of the three defendants for weapons and discovered none. Thereafter, Casey went to his car to request assistance by radio. A group of on-lookers began to assemble, and McArdle took the precaution of moving the suitcase dropped by Rojas out of the defendants' reach and nearer his own. In doing so, he zipped open the unlocked suitcase to determine whether it contained weapons or contraband and immediately perceived that it contained a substantial amount of what he correctly determined was cocaine.

Following the arrival of other law enforcement officers, all three defendants were searched more thoroughly. A second telephone beeper was removed from Cardona's person. Various incriminating papers were seized from each defendant's person. Finally, a search of the two suitcases in the open trunk of the Rojas-Cardona car preparatory to the seizure and transfer of the car and contents to the custody of the Drug Enforcement Task Force revealed an additional 35 kilograms of cocaine.

Questioning of the defendant Parra by an agent of the Drug Enforcement Agency, who had responded along with others to McArdle and Casey's request for assistance, occurred under the following circumstances. The agent, Donald Abrams, initially approached defendant Parra, apparently unsure who he was, and asked him, "who are you?" Parra answered, in a statement which the government does not intend to offer at trial as evidence of guilt,

"I'm afraid." A few minutes later Abrams escorted Parra to his own vehicle and advised him of the reason for his arrest, as well as of his *Miranda* rights—this being the third occasion Parra had heard them that night. Parra said he understood his rights. Thereafter, when asked his name, he gave what the government contends is a false one, although it corresponds to a name that appears on a driver's license and registration taken from Parra's person at the time of his arrest. Questioned further, Parra exercised his rights under *Miranda* and refused to respond. The agent did not, however, stop questioning the defendant, but instead told him in substance that answers to questions about his personal background were needed in order to determine if the defendant was eligible for bail. The defendant then told the agent that his true name was Frank Parra, that he had lived in New York for one year legally as a native of Colombia, that he had been arrested in Miami in connection with an offense involving 600 grams of cocaine, and was a fugitive. All of these statements by Parra are sought to be introduced by the prosecution at trial.

After the arrest of the three defendants, searches were conducted of four separate locations associated with the defendants. Evidence secured at three of those locations is sought to be introduced at trial.

Evidence secured at the premises of 100–14 Spruce Avenue, where the surveillance commenced, in the form of three kilograms of cocaine and $16,780 in cash the government argues is appropriately used at the trial of all three defendants without regard for the manner in which it was seized since none of the three defendants has established standing to complain of the search. Only defendant Rojas purports to have some connection with the premises and that connection is simply the fact that he had left some possessions at the house, which was concededly not his residence but that of his sister and parents.

The search of an apartment at 170–62 Cedarcroft Road is conceded by the prosecutor to have been illegal since it occurred without a warrant and without any excep-

tion to the warrant requirement being applicable. The prosecutor seeks to use the two kilograms of cocaine, $473,370 in cash, and a passport of defendant Cardona found pursuant to the search on the theory that none of the defendants has established standing to complain of the search's illegality. Only defendant Cardona in fact claims standing. The apartment was entered using keys obtained from Cardona's person, his clothing and passport were found in the premises along with the substantial amount of cash and contraband.

Finally, the prosecution seeks to introduce at trial evidence secured at the residence of defendant Parra at 221–29 59th Avenue, Bayside, Queens. This search was also made without a warrant. The prosecutor seeks to justify the search based on defendant Parra's oral consent. The circumstances surrounding the alleged consent to search Parra's apartment are as follows:

Following Agent Abrams' insistence that he respond to questions concerning his pedigree, Parra gave information about his personal background as noted above. When asked about his employment, however, he again declined to answer. Agent Abrams then departed from pedigree questioning entirely and asked Parra, first, if there was anyone else "that might be arrested with him" and whether "at the residence you gave me, is there anyone there?" Faced with these questions, Parra answered "no" and, when questioned immediately thereafter whether he would consent to a search of the residence, answered "yes, nothing is there."

After this colloquy, Agent Abrams transported Parra to DEA headquarters. On the 59th Street bridge, Parra asked how soon he could speak to his lawyer. In response Abrams said he could call his lawyer from the DEA office "during or after processing." At DEA headquarters and before being allowed to contact his lawyer, Abrams gave Parra a consent to search form. "[T]here were blank spaces on there that we told him had to be filled in, name, address and that sort of thing, and I said would you please read this and we will fill in the blanks, and it appeared to me that he began to read it, and I don't think he completed it, and simply he turned to me and said, 'I would rather not sign it until after I spoke to my attorney.'" Nevertheless, the agents proceeded to search the premises without permitting Parra to consult his attorney or obtaining a search warrant.

## SUPPRESSION

As noted, all three defendants seek to suppress the cocaine and other tangible evidence seized at the time of their arrest. In addition, defendant Rojas seeks to suppress the oral statements made by him at the time of his arrest and evidence seized from the house at 100–14 Spruce Avenue. Defendant Cardona seeks to suppress evidence seized from the apartment at 170–62 Cedarcroft Road. Defendant Parra seeks to suppress oral statements made at the time of his arrest and evidence seized from the apartment at 221–29 59th Avenue, Bayside.

Defendants claim that Agents McArdle and Casey lacked probable cause when they first approached defendants, and, therefore, their arrests and the statements and searches that followed them were unlawful. They contend that the agents' initial display of authority was tantamount to an arrest. The government argues that defendants were not initially arrested but were lawfully stopped for investigative purposes and that events subsequent to the investigative stop provided the officers with probable cause to arrest them.[1]

■ The fourth amendment requires that warrantless arrests be predicated on probable cause. "Probable cause for arrest 'exists when the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been

---

1. The government also contends that events prior to the investigative stop were sufficient to give the officers probable cause to effect an arrest.

or is being committed.'" *United States v. Ginsberg,* 758 F.2d 823, 828 (2d Cir.1985), *quoting Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11 93 L.Ed. 1879 (1949) (citations omitted). It is not necessary that there be an actual showing of criminal activity but only "a probability or substantial chance of criminal activity." *Illinois v. Gates,* 462 U.S. 213, n. 13, 103 S.Ct. 2317, n. 13, 76 L.Ed.2d 527 (1983); *Ginsberg, supra* at 828.

██ Probable cause is also required when police forcibly detain a suspect in circumstances that, although not technically an arrest, are nonetheless so intrusive as to be tantamount to an arrest. *See, e.g., Florida v. Royer,* 460 U.S. 491, 503, 103 S.Ct. 1319, 1327, 75 L.Ed.2d 229 (1983); *Dunaway v. New York,* 442 U.S. 200, 212–16, 99 S.Ct. 2248, 2256–58, 60 L.Ed.2d 824 (1979); *United States v. Marin,* 669 F.2d 73, 81 (2d Cir.1982); *United States v. Vasquez,* 638 F.2d 507, 521 (2d Cir.1980). When, however, police detain an individual in a manner that is not the functional equivalent of an arrest, the fourth amendment requires that the investigative stop be, in all of the circumstances, reasonable. *See, e.g., Royer, supra,* 460 U.S. at 512, 103 S.Ct. at 1331; *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 44 L.Ed.2d 889 (1968). The officer must have a reasonable suspicion of criminal activity based upon "specific and articulable facts ... [and] rational inferences from those facts." *Royer, supra* at 512, 103 S.Ct. at 1331, *quoting Terry, supra,* 392 U.S. at 21, 88 S.Ct. at 1879. Moreover, the extent of the intrusion must be no greater than the circumstances require. *United States v. Ceballos,* 654 F.2d 177, 182–83 (2d Cir.1981); *Vasquez, supra,* 631 F.2d at 521.

██ In the present case, there seems little doubt that the agents had a reasonable suspicion of criminal activity based on specific and articulable facts when they first approached the defendants. The agents had observed Rojas and Cardona depart from a location the officers had under surveillance in connection with an ongoing investigation into cocaine trafficking. Immediately upon their departure

from this location, Cardona made a call from a public telephone, even though the residence they had just left contained an operative telephone. After driving to a location off Francis Lewis Boulevard, the two engaged in erratic driving, including U-turns, varying speeds and frequent stops for fifteen minutes. These maneuvers strongly suggested that defendants were engaged in counter-surveillance. Finally, the officers' suspicions were further aroused when Parra arrived and the two cars pulled over to a darkened area of the street. When the trunks of both vehicles were opened and the transfer of suitcases commenced, the agents had a solid basis for approaching defendants to conduct an investigative stop.

██ Whether the agents then approached defendants in a manner consistent with a *Terry* stop or in a manner tantamount to an arrest, for which probable cause is required, turns on such factors as the number of police officers and cars used to effect the stop, whether the police completely impeded defendants' movement, and whether the police officers had their guns drawn and in view. *See Marin, supra,* 669 F.2d at 81; *Ceballos, supra,* 654 F.2d at 183 n. 9; *United States v. Jackson,* 652 F.2d 244, 249–50 (2d Cir.1981); *Vasquez, supra,* 638 F.2d at 521.

██ Assuming that the officers' initial approach was within the confines of a *Terry* stop, or that the officers did not have probable cause to arrest at the time they approached defendants, it is clear that Parra's attempt to flee after the agents identified themselves was sufficient to elevate the officers' reasonable suspicions into probable cause.

> "[D]eliberately fugitive actions and flight at the approach of strangers or law enforcement officers are strong indicia of *mens rea* and, when coupled with specific knowledge on the part of the officer relating the suspect to crime, they are proper factors to be considered in the decision to make an arrest."

*Sibron v. New York,* 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968); *United States v. Young,* 750 F.2d 220, 222

(2d Cir.1984); *United States v. Gomez,* 633 F.2d 999, 1007 (2d Cir.1980); *United States v. Follette,* 418 F.2d 609, 611 (2d Cir.1969).

■ However, in the view of the undersigned, the classification of the officers' initial approach as an investigative stop or as an arrest is unnecessary in the circumstances of this case since there was probable cause to arrest the three before Parra's flight. The combination of circumstances, including the connection of the defendants with a location in turn connected with a known narcotics trafficker, the use of the public phone, the erratic driving, the meeting at a darkened location, the transfer of suitcases, all lead to the reasonable conclusion that a drug transaction was in process. But, I also conclude that the initial stop was not so restrictive of the defendants' liberty as to be the equivalent of an arrest. The defendants outnumbered the two agents. The officers' cars were not used in such a way as to prevent movement. While firearms were displayed and while Agent Casey shouted, "don't move" after identifying himself, there is no reason to suppose that the restriction on liberty implicit in these circumstances would not be lifted immediately after a brief investigation of the suspicious circumstances confronting the officers.

■ Defendants also seek to suppress the cocaine and documents seized at the time of their arrest.[2] It is well settled that, when a suspect is under lawful custodial arrest, the police may conduct a warrantless contemporaneous search of the

person arrested and the immediately surrounding area. *New York v. Belton,* 453 U.S. 454, 457, 101 S.Ct. 2860, 2862, 69 L.Ed.2d 768 (1981); *Chimel v. California,* 395 U.S. 752, 753, 89 S.Ct. 2034, 2035, 23 L.Ed.2d 685 (1969). The rationale for the exception is to permit the police to secure any concealed weapons and to prevent the concealment or destruction of evidence. *Belton, supra,* 543 U.S. at 457, 101 S.Ct. at 2862. Accordingly, the exception has been held to encompass the interior of "containers," including luggage that are themselves within the immediate control of the person in custody. *See, e.g., United States v. Torres, supra,* 740 F.2d at 128; *United States v. Hayes,* 553 F.2d 824, 826 (2d Cir.1977); *United States v. Edmonds,* 535 F.2d 714, 720 (2d Cir.1976); *United States v. Currington,* 451 F.Supp. 39, 43 (S.D.N.Y.), *aff'd,* 609 F.2d 999 (2d Cir.1978).

■ After the defendants were placed under arrest, Agent Casey returned to his vehicle to request assistance. This left Agent McArdle with sole custody of the three defendants, two of whom were not handcuffed. The area was dark, and onlookers had begun to approach. Concerned about his safety and the possible theft of the suitcase, McArdle moved the suitcase away from defendants and partially searched it. This search clearly was reasonable. The suitcase was removed from defendants' immediate control, and the officer had good reason to suspect that it contained weapons and/or contraband.

---

**2.** The government contends that none of the defendants have standing to object to the search of the suitcases. With respect to Cardona, the government argues that none of the suitcases were taken from his possession and that he has no ownership interest in the vehicle into which two of the suitcases were transferred. As for Rojas, the government states that he denied ownership of the suitcase in his possession and disclaimed any knowledge of the other suitcases. As for Parra, the government contends that there is no claim of ownership as to the suitcases and no indication that, once the suitcases were transferred, Parra had any right to exclude others from access to these suitcases. With regard to Cardona, it seems clear that he had no reasonable expectation of privacy in any of the suitcases and, therefore, lacks standing to challenge the legality of the search. *See Rawlings v.*

*Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *United States v. Salvucci,* 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980). However, as for the other two defendants, there does seem to be sufficient interest in the suitcases to confer standing. First, Rojas had a reasonable expectation of privacy in the suitcases that were transferred into his trunk. As for the claim that Rojas abandoned the third suitcase, there do not appear to be sufficient facts indicating Rojas' complete abandonment of the suitcase. *Compare United States v. Torres,* 740 F.2d 122, 127 (2d Cir.1984). As for defendant Parra, there is no basis for concluding that, once Parra transferred the suitcases from his car to the trunk of Rojas' car, he abandoned any reasonable expectation of privacy in its contents.

██ The contemporaneous search of the two suitcases left in the trunk of Rojas' vehicle was also lawful. The agents at that point had probable cause to believe that both the car and the suitcases contained weapons and/or narcotics and had been used in narcotics transactions. Both, therefore, were subject to an immediate inventory search pursuant to the automobile exception of the warrant requirement. *See Michigan v. Thomas,* 458 U.S. 259, 261, 102 S.Ct. 3079, 3080, 73 L.Ed.2d 750 (1982) ("It is clear that the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that it contents would have been tampered with, during the period required for the police to obtain a warrant."); *see also United States v. Ross,* 456 U.S. 798, 807 n. 9, 102 S.Ct. 2157, 2163 n. 9, 72 L.Ed.2d 572 (1982); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1977).

Defendants Rojas and Parra seek to suppress their post-arrest statements not only as the fruits of their allegedly unlawful arrest but also on the ground that they were involuntary and obtained without adequate advice as to their constitutional rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 694 (1966).

██ Since there appears to be no dispute that the defendants were subject to custodial interrogation when the statements were made, the threshold question is whether or not defendants in fact received and understood the *Miranda* warnings. I conclude that they did and that the two defendants validly waived their right to remain silent. The burden is on the government to establish that the defendants' waiver was knowing, intelligent and voluntary. However, an express oral or written statement is not necessary to establish a valid waiver, *see North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *United States v. Rubio,* 709 F.2d 146 (2d Cir.1983). Since both

defendants were questioned immediately following the warnings, since both defendants said they understood them, and since both defendants shortly thereafter exercised their rights to stop the questioning, taking these factors together with all of the other factors noted below with respect to voluntariness, I am persuaded that those questions they answered prior to exercising their rights were the product of a knowing and voluntary waiver.

██ Since the prosecutor seeks to introduce only those statements by defendant Rojas made after his waiver of his *Miranda* rights and prior to his declining to speak further, the only issue remaining is whether the statements made were voluntary. I find that they were. Although the statements were made while the defendant was being held, for security reasons, on the ground, after having been brought to that position at gunpoint, the defendant had heard the *Miranda* warnings repeated twice, had displayed enough understanding and willpower to answer that, while he understood his rights, his companion Cardona did not and thereafter to interpret the warnings into Spanish. In addition, the defendant cut off questioning shortly after it began. On all the circumstances, I find no reason to suppress the statements made by defendant Rojas.

The statements of defendant Parra sought to be introduced by the government present somewhat different problems. While I am persuaded that the defendant's initial statement identifying himself by another name was properly obtained following a waiver of the defendant's rights under *Miranda,* subsequent statements admitting the misidentification and referring to his prior record and fugitive status came after the defendant had invoked his *Miranda* right to silence. The government seeks to justify the continued questioning of the defendant under that line of cases that permits questioning concerning pedigree despite a defendant's invocation of his right to silence. *See, e.g., United States v. Gotchis,* 803 F.2d 74, 78–79 (2d Cir.1986); *United States ex rel. Hines v. LaVallee,* 521 F.2d 1109 (2d Cir.1975), *cert. denied,*

423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976). The circumstance which takes this case beyond *Gothis*, however, is the fact that the pedigree information was elicited under circumstances that raise questions as to the voluntary nature of the responses.

After the advice of rights, during which Parra was told "if he didn't want to answer a particular question or wanted to stop questioning, he had a right to do so," Agent Abrams asked Parra his name and residence, both of which Parra voluntarily supplied. (Accordingly, the responses to these questions are clearly admissible.) Parra refused to answer questions, however, about his date of birth, social security number, or employment background. The agent then "explained to him that he wasn't going to be forced to answer the question, but if he didn't answer the background questions, it [sic] would be presented to the judge the next morning for bail purposes, and bail wouldn't be granted if he didn't answer the basic questions as to who he was." Moreover, both before and after this questioning by Abrams, Parra displayed signs of considerable emotional turmoil as a result of his arrest.

■■■■ However, Abrams appears generally to have dealt with Parra's expressed fears fairly, explaining to him who the law enforcement officers were who had appeared at the time of the arrest, removing him to a car where he was not unnecessarily confronted by the large numbers of officers present, rationally explaining why, despite his rights to remain silent, it would make sense to disclose basic information about his identity in order to give himself an opportunity to be released, and generally refraining from exploiting the man's fears to develop incriminating information. Having considered all of the circumstances, I conclude that Parra's responses to the agent's pedigree questions were voluntary, that is, that the conduct of "law enforcement officials was [not] such as to overbear [the defendant's] will to resist and bring about confessions not freely self determined." *United States v. Ferrara*, 377

F.2d 16 (2d Cir.1967), *quoting Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961).

■■■■ The questioning of Parra did, however, go beyond pedigree information, as the agent conceded. As the agent described it, ". . . then we began a discussion relative to what our interests as law enforcement officers were in relation to the cocaine that was seized and anything else that might be available and everything else that might—anyone else that might be arrested with him. At that point, I specifically asked him, at the residence you gave me, is there anyone there? Any cocaine or substantial amount of moneys there. He said, no. I said are you sure. He said O.K. [sic] And I said: Would you give us consent to search there? He said yes, nothing is there." It is clear that these statements, made after the defendant's exercise of his *Miranda* rights and in response to questions going far beyond the defendant's pedigree, were illegally obtained and must be suppressed.

*Searches of the Three Apartments*

As noted, defendants also move to suppress the cocaine, $700,000 in cash, and other items seized from three searches subsequent to their arrest. The government seeks to justify the searches on the basis of consent or argues lack of standing in the defendants to complain.

*100–14 Spruce Avenue.* The Spruce Avenue residence was that which Rojas and Cardona were seen leaving on the evening of their arrest. According to the government, subsequent to his arrest, Rojas advised agents that he resided at 24–27 77th Street, but that his parents resided at 100–14 Spruce Avenue and that he kept some possessions at the latter location. Rojas claims to have a reasonable expectation of privacy in his parents' house and that neither he nor anyone else consented to a search of the premises. He, therefore, seeks to suppress the 3 kilograms of cocaine and $16,680 found in the first floor of the apartment.[3]

**3.** Neither Cardona nor Parra claim to have    standing to object to the search.

■■■ The threshold question is whether Rojas has standing to object to the search of the residence. To establish standing, Rojas must have something more than a possessory interest in the property seized; he must have a reasonable expectation of privacy in the place searched. *See Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Salvucci,* 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980). Factors to be considered in ascertaining the existence of reasonable expectation of privacy include:

> "Whether the defendant has a [property or] possessory interest in the thing seized or the place searched, whether he has the right to exclude others from the place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal procedures to maintain his privacy and whether he was legitimately on the premises."

*United States v. Robinson,* 698 F.2d 448, 454 (D.C.Cir.1983), *quoting United States v. Haydel,* 649 F.2d 1152, 1155 (5th Cir. 1981). Based on all the circumstances, it appears clear that Rojas lacks standing to complain of the search of Spruce Avenue. He had no property interest in the premises. While it may be inferred that he was on the premises the day of his arrest, his last prior visit according to his sister's testimony was months before. His residence was elsewhere, by his own admission. There is no evidence that he had exhibited to anyone an expectation that the premises would be free from inspection by others and the apparent readiness of his relatives to let the officers look about indicates that he had never expressed a desire to them that they or others stay out of the closet where the cocaine and cash were found, which was apparently unlocked. Accordingly, defendant Rojas' motion to suppress evidence seized at Spruce Avenue must be denied.

*170–62 Cedarcroft Road.* The search of the Cedarcroft Road apartment presents more troublesome issues. To start with, the government acknowledges that the search was illegal. It contends, however, that none of the defendants has demonstrated a legitimate expectation of privacy in the premises.

The only defendant who claims an interest in the premises is Cardona, although the searchers were led to the apartment because of documents found at the premises at Spruce Avenue occupied by the sister of defendant Rojas. During the course of the search of those premises, agents found a Con Edison bill in the name of Maria Gonzales for the residence on Cedarcroft Road and a receipt for a money order made out to the landlord of the Cedarcroft Road apartment. When questioned about these, defendant Rojas' sister explained that she had been given a series of money orders by Maria Gonzales to pay the rent on the premises and had been doing that for some three months, apparently in Ms. Gonzales' absence from the city. Asked if she had keys to the apartment, however, Ms. Rojas stated that she did not.

When the agents arrived at the Cedarcroft Road apartment, they were told by neighbors that an Hispanic couple had lived in the apartment for a period of time starting some six months earlier but had not been seen recently. Instead, a couple of Hispanic males had been seen to come to the apartment "on occasion."

The agents first attempted to enter the apartment using a set of keys Ms. Rojas had brought with her from Spruce Avenue. However, none of them fit. Using keys seized from the defendant Cardona (who had been described by defendant Rojas as living with him at another address), the agents were able to open the door of the apartment. They found the interior "sparsely furnished," with, however, a mattress against a wall, a television set, and a coffee table. No food or cooking utensils were found in the kitchen. In a. closet the agents discovered clothing hung on hangers including a man's suit in which was found the Colombian passport of the defendant Cardona. Also found on the premises was a lease for the apartment in the name of a couple named Posada for a one-year period commencing June 4, 1986.

The defendant Cardona did not testify at the hearing as to the nature of his connection with the premises. However, I attribute no great significance to this since it seems apparent that he could only confirm the obvious, namely that the premises were being used by him as a "stash pad" for the concealment of narcotics and the proceeds of their sale, both of which were found in abundance. Approximately $493,000 in U.S. currency was found in a closet along with 12 kilograms of cocaine wrapped in the same fashion as the cocaine seized from the three defendants at the time of their arrest.

▬▬▬ As already noted, the issue is whether from these facts it may be inferred that the defendant Cardona subjectively possessed at the time of the search a reasonable expectation that the apartment would remain free from governmental invasion. Presumably, the expectation must, moreover, be a legitimate one: that is, the simple desire to hide contraband and its proceeds should not be sufficient to establish a reasonable expectation of privacy worthy of fourth amendment protection. Cf. *Rakas v. Illinois*, 439 U.S. 128, 141 n. 9, 99 S.Ct. 421, 429 n. 9, 58 L.Ed.2d 387 (1978). (So too, the fact that it may be inferred that the rent was ultimately paid with the proceeds of drug trafficking in which Cardona had an interest does not make him a person with a "legitimate" interest in the premises. *Id.*)

▬▬▬ Nevertheless, I conclude on balance that the defendant Cardona, over and above his illegitimate hopes and expectations, possessed subjectively a reasonable and legitimate privacy interest sufficient to give him standing. Put another way, a totally innocent person having the same legitimate connections with the premises as Cardona had would, I find, have felt his privacy unreasonably invaded by the warrantless search of the apartment. The door was locked. Only Cardona had a key to the premises. Another person with sufficient interest in the premises to have been made responsible for the payment of rent

did not. Cardona's unpacked clothing was found in a closet on the premises along with a valued legitimate possession, his passport. While Cardona's home, like that of the plaintiff in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), was elsewhere, the apartment nevertheless was a place where he could, with confidence, leave his passport, change his clothes, and sleep without fear of unwarranted intrusion. Under all the circumstances, I conclude that he possesses standing to complain of the search, and since the search was unreasonable, the seizures made pursuant to it must be suppressed. *United States v. Ochs*, 595 F.2d 1247 (2d Cir.1979); *United States v. Chen*, 629 F.Supp. 263 (S.D.N.Y.1986); *United States v. Hall*, 508 F.Supp. 1028 (D.Del.1981); cf. *United States v. Evans*, 629 F.Supp. 1544 (D.Conn.1986).

▬▬▬ *221–29 59th Avenue.* The search of what is conceded to be Parra's residence, which yielded 4 kilograms of cocaine and $213,365 in cash is sought to be justified by the oral consent of Parra obtained under the circumstances already described. Whether this consent survived Parra's later request to consult with his attorney before complying with the agent's request to express it in written form or was voluntary need not be resolved since the consent was clearly the tainted product of questioning in violation of *Miranda*. As noted above, the consent came after the agent had left matters of pedigree behind and turned to substantive issues of guilt or innocence and after Parra had exercised his right to remain silent. Having, by this process, elicited Parra's protestation that there were no narcotics or money at his residence, the agent then immediately exploited the results of this illegal questioning by pressing for defendant's consent to search the supposedly empty apartment. The search is, as a result, tainted with the illegality of its origins, and the evidence discovered by this means must be suppressed.

## SEVERANCE

Defendant Parra requests a severance pursuant to Fed.R.Crim.P. 14[4] on the ground that the "prejudicial spillover" of the evidence introduced against his co-defendants would jeopardize his right to a fair trial. Parra argues that prior to the night of the arrest government agents knew of no connection between himself and the co-defendants, although both co-defendants had been under surveillance for the previous month. Moreover, Parra asserts that the government will not be able to show any connection between himself and the large sums of money seized from the co-defendants' apartments.

 A defendant seeking a Rule 14 severance bears a "heavy burden" of showing that a joint trial will cause him "substantial prejudice" and a denial of a fair trial. *United States v. Carson*, 702 F.2d 351, 366 (2d Cir.1983); *United States v. Losada*, 674 F.2d 167, 171 (2d Cir.1983). The fact that a defendant might have a better chance of acquittal at a separate trial does not constitute substantial prejudice. *Carson, supra* at 366. Nor does the fact that evidence may be admissible against one defendant but not another necessarily require a severance. *Id.; Losada, supra* at 171.

Parra's claim that he will be substantially prejudiced by the "spillover" effect of evidence admissible only against his co-defendants cannot be sustained. As to the evidence suppressed on his motion, it may be assumed that the government will not offer this evidence at a joint trial. As to other evidence which might be admitted against some but not all defendants because of lack of connection, the limited number of defendants greatly minimizes the likelihood of jury confusion. *See Carson, supra* at 362; *Cunningham, supra* at 230. There has been no showing that any possible confusion could not be adequately avoided by appropriate instructions. Absent a greater showing of confusion or prejudice, the defendant's request for a separate trial must give way to the public interest in avoiding duplicative trials. *United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir.1984); *United States v. Potamitis*, 564 F.Supp. 1484, 1486 (S.D.N.Y. 1983), *aff'd*, 739 F.2d 784 (2d Cir.1984).

Accordingly, Parra's motion for severance is denied without prejudice to its renewal in the event the government seeks to use evidence suppressed as to Parra at a joint trial.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.

---

**4.** Since Parra is charged with participating in a series of acts or transactions that were part of a conspiracy, joinder was permissible under Rule 8(b). *United States v. Cunningham*, 723 F.2d 217, 229–30 (2d Cir.1983).